This Court of Appeals for the Ninth Circuit is now in session. Thank you. May be seated. Good morning and welcome to the James R. Browning U.S. Courthouse here in San Francisco. It's a pleasure to see you all here today. The first case set for oral argument on our calendar this morning is Tavra Brands, LLC versus Bayer Healthcare, LLC. And that has been submitted on the briefs. The next case is Surgical Instrument Service Company, Inc. and Federal Trade Commission versus Intuitive Surgical, Inc. The counsel are ready to proceed. You may come forward. And yes. Thank you. Good morning, Your Honors. Eric Citron for Plaintiff and Appellant SIS. May it please the Court. I think the defining characteristic of this case is that neither the defendant nor the district court has ever really proposed a reason why it would make sense to inject the Kodak factors into a case like this one. And just as a matter of basic logic or antitrust first principles, it doesn't make sense to do so. Those lock-in factors have a purpose. They're meant to assess whether customers are so locked into a given brand that even though there is a competitive market upstream where they could choose among alternatives, they nonetheless find themselves at the whim of a defendant's market power in the downstream market. But that, of course, only matters if there is a competitive market upstream and the plaintiff has chosen to avail themselves. The disputed jury instruction at issue here applies not only to your tying claim, but also to your attempted monopolization, monopolization, and exclusive dealing claim. But all the issues are only briefed as a tying case. So why is that? Are all of your causes of action, basically, they all boil down to a tying claim? I think the right way to think about it, we walked through this in the opening brief a little bit, the different theories and how they all kind of boil down to the same theory of market power. But that's the answer for all three theories. We are asserting in each case that the source of the defendant's power is their power over the upstream equipment market where interbrand competition would occur. And for each of these claims, the reason why there is a market power element is because we're trying to figure out where whether and where the source of the defendant's power to cause customers or counterparties to do things they wouldn't do in a competitive market where it comes from. So all three theories depend on the same theory of market power. So does the applicability of the Kodak Epic factors, it doesn't depend on the type of claim here, right? You wouldn't have a different test for that application based on tying versus monopolization versus exclusive dealing. I think that's right. If there is a competitive market, you know, I think the right test is the one that's set forth in our review and in the FTC's brief. And I think that the essence of it is if your theory of market power comes from a competitive interbrand market upstream, you're not trying to define a carefully defined single brand aftermarket as a way of sourcing the defendant's power. There's no reason to look to the Kodak factors. They aren't doing any work in any of those antitrust theories. And does it matter if it's alleged to possess monopoly power versus market power? So, I mean, I think I have to point out that in our case, it is monopoly power of sort of the highest order. And that's all we would have to decide to answer a case like this one presented. The FTC argues for a test based on market power. In our reply brief, we undertake to show that the right test is based on market power. And I think if you take seriously the definition of market power, that's the right answer. If they have the power to force people to do things they wouldn't do in a competitive market, they have enough power for the power element of these antitrust claims. And it doesn't matter that there is our potential competitors. We mean by market power that the market is not competitive enough to discipline the aftermarket, which is what we actually care about. I guess I was just curious. What if the for market share is 60 percent or 70 percent? I'm trying to figure out what the threshold is when Kodak becomes maybe irrelevant. Well, I think the important thing to bear in mind is that market share and market power are not the same thing. They are just proxies for each other that we sometimes use. And it is, of course, possible to imagine circumstances in which you have market power, even without a hundred percent share, because of a variety of market factors, including the concentration of the other competitors in the market, the difficulty of switching the barriers to entry, etc. It is also possible the other way to imagine having a very high market share, but nonetheless having a competitive market because entry is very easy. And if you ever tried to exploit your market power, others would enter to compete it away. So share and power aren't the same thing. And I think what you should really concern yourself with is market power. The question is just, do they have enough power to force people to do things they wouldn't do in a competitive market? And so I wouldn't tie the applicability to a potential Kodak case to any given market share. I just want to point out one other thing that I'm at pains to point out, which is that Kodak is an alternative theory of market power. It's an expansion of potential antitrust liability that the Supreme Court makes available to plaintiffs if they choose to go down that road. You can prove either power in the upstream market, the interbrand market where competition would occur, or you can try to prove lock in. If we think we can prove enough market power just by using that upstream market, their dominance of that upstream market, we don't need to invoke Kodak. And we didn't here. And that's why once the district court wanted to give this instruction, it went back on the thing it had correctly decided the night before. We conceded that we couldn't prove the case because that wasn't even our theory of the case. We hadn't put in that evidence. So you may have just answered this question in a way. But would intuitive be free in your view to argue that the relevant for market is not the missed robots, but just surgical devices or methods? And would that then bring Kodak into play? They are totally free to argue that, you know, that is the ordinary antitrust question that I think, you know, would be contested in a case like this one. Is missed surgical robots a relevant market? Does their complete dominance of that market mean that they have market power? Or are there substitutes in the form of other kinds of surgery? We just have a lot of evidence that we are right, that it is a relevant market, but that's for the jury to decide. Like 100%, that's the right answer on that front. The end of your question was, if they proved that, would Kodak come into play? And I think that my answer to that is that that would be a choice for the plaintiffs, whether they wanted to present an alternative Kodak theory. They certainly could. If by hypothesis, they've proven that we don't have a relevant market in missed robots, and we aren't pursuing a Kodak theory, we don't have any way left to prove market power. At that point, we'd have to prove the Kodak factors or give up the ghost. But it would nonetheless be a choice because there are alternative theories of market power that are available to the plaintiff. And another way of saying that, which I think is important for the framing of the cases, we're not asking for any kind of exception to Kodak or the lock-in factors. We're just saying if you're not bringing a Kodak case, you don't have to prove the Kodak factors, which I think makes eminent sense as a matter of antitrust doctrine. And let me ask you because I think intuitive is also arguing this and trying to figure out why isn't this a case in which market power arises from the contractual terms that consumers knowingly and voluntarily gave? I mean, I think there are contractual terms that are, you know, we don't agree. We don't argue that they are like a surprise, that there's some element of surprise in things. But as a matter of antitrust law, we're actually maximally concerned with circumstances in which the power comes from having a dominant position in the market and the lack of alternatives for consumers. So we didn't freely choose these conditions in the terms that antitrust law cares about because we face the market power of a monopolist and we don't have competitive alternatives to use to discipline that power. And Epic actually makes this point like very clearly in the opinion. It says we can't treat the mere fact that this isn't a surprise as sufficient because then you could never have a tying case, including in the cases where you most need it, which is where a monopolist uses their market power to impose a tie. So the element of surprise is not a necessary element. It can be part of a Kodak theory. But like if we are saying that we had to choose these contractual arrangements because we didn't have competitive alternatives, that's just like the essence of a monopoly or market power based milquetoast antitrust claim. Under your theory, does it matter whether the tied and tying market are foremarket and aftermarket or if they're both aftermarkets? Well, in our case, we think that the tying market is a foremarket. And I don't think you'd have to say anything beyond that in order to answer our case. I think that the answer to your question is that it could matter, but it doesn't really. Why would it matter? I think in cases that involve only a foremarket and an aftermarket where the tying market isn't even an aftermarket, you're not going to have a Kodak issue because it's by hypothesis, it's for aftermarkets where the tying market is an aftermarket. But I also think the way that this really – the rubber hits the road in an antitrust case and the most helpful thing to explain to the district courts is that like the defendant is free to argue that there is some upstream market that disciplines the relevant market that we've attempted to describe. And if they do that, we have one of two choices. We can prove either that there isn't that discipline because there's ordinary indicia of market power, right? There's a dominant position in what is correctly described as a relevant market. Or we can try to create a disconnect between that upstream competitive market and the tying market or the market power market that we're alleging using the Kodak factors. But what matters ultimately is that this be a case in which that question is the one that's being litigated. And you can search the record front to back and you will not find the defendants arguing that there is some market above the market for Mr. Robots that disciplines our market, right? And how do we know how far upstream to look to identify the relevant foremarket? I think my view of that is the defendant can argue for whatever upstream market they want to argue. I think they are free to say that the market power we are trying to prove is disciplined by some competition somewhere else. The question is just whether that connection exists as a first order, right? You can just say like, as Epic puts it, right? The Supreme Court folded the ordinary principles of market definition into aftermarket cases, right? You just ask, is there cross elasticity of demand? Is there actual substitution occurring way upstream there? If there isn't substitution occurring way upstream, it's not a relevant contribution to the case that there are. You can always hypothesize some market upstream from yours. There's like the market for all goods and services. That thing has to have a relevant enough connection to your case under ordinary tests of market definition and market power in order for it to make any contribution. What would be your ideal statement of the rule? Because if you were to prevail, there seems to be a number of ways you can go. It could be extremely narrow or it could be slightly broader. What's your ideal statement of the rule? I think our ideal statement of the rule appears in the FTC's brief. And it's something like in a case where the plaintiff alleges that there is dominance in the upstream market or they undertake to prove market power in the upstream market. They do not need to prove the lock in factors in order to meet that element of their antitrust case. And why isn't your rule likely to generate a flood of aftermarket litigation? Well, there's a couple of reasons. I want to give two basic categories or answers. One is our case does not involve an aftermarket as the tying market as the source of market power. And what the lock in problem is meant to address is plaintiffs gerrymandering their market definition so that the source of power is a market where the brand has control because it has control over the brand and not control over all the available substitutes. Right. So we're not bringing an aftermarket theory of market power in this case. So it really should have no effect whatsoever on any aftermarket case cases in the future. And I think that that's the right way to think about it. As I said, we're not asking for some kind of exception or change in the rules, you know, to which lock in the kinds of cases to which lock in factors would apply. The other answer is like the market power element of an antitrust case is not the only restraint on having a winning antitrust claim, you have to prove the rule of reason. In this case, we have to prove that there's an anti-competitive effect. But and even more than that, right, we have to prove that these are truly separate products in a tying case. Right. So like there are lots of different ways in which we have to prove more than market power. Market power is just a necessary predicate to a viable antitrust case. And that's that's all we're saying. And this may be going back to what we started with, but our district courts are supposed to litigate market power in the foremarket before deciding whether the Kodak factors should be considered. Right. As I said, I think the best answer to that question is that Kodak is an alternative theory of market power. This is in my colloquy with Judge Thomas. And what they would be presented to as a jury trial is there are two possible theories. Do you find that there is market power in the upstream market, in which case Kodak factors are not necessary? Or if the plaintiff wants to make this alternative claim, do you find that notwithstanding the competitive upstream market, the lock-in factors are present and there isn't disciplining of an aftermarket? If you've defined that aftermarket as the source of the tying power, which we haven't done, so it's just not presented. So we don't have a verdict. How would the verdict form have what you just said right now? Well, the instructions, the verdict form doesn't have to read that way. It'd be a question of instruction or verdict form. But it would say, yes, do you find this? If so, don't bother with the next question. If you don't find it, answer the next question. And that's if the plaintiff wants to present that theory. Again, like that isn't our theory of this case. The reason the Kodak factors shouldn't be present is because even if we're wrong about the upstream relevant market, we haven't tried to prove lock-in because it's not the mechanism that we think is driving the market power in this case. Is your preferred rule statement limited to tying claims? I don't think so. I think the right way to think about it is that it's a question of market definition where you're trying to define the market in which the market power that drives your antitrust claim arises. So wherever the market power, like, you know, essentially every antitrust claim requires market power or monopoly power of some kind because otherwise competition would discipline whatever anti-competitive practice you're concerned about. And if you're trying to define that market without trying, you know, by proving that there is no competition in whatever the relevant upstream market is, then there shouldn't be any need for the Kodak factors. They aren't doing – it's really honestly like a pretty common sense principle, but you have to be bringing a Kodak type theory. You have to be saying that lock-in is what breaks the, you know, disciplining chain in order for the lock-in factors to matter. And all we're saying is if that's not your theory of the case, you don't have to prove lock-in. The rule wouldn't address tying between two aftermarkets, right? By definition, by your saying, you know, dominance in the upstream market is, you know, premised on there being a foremarket and aftermarket. I think that's right. So you want to just leave that for another day whether Kodak ethic factors apply when they're – I think I don't want to leave it for another day, but I also don't think that it's necessary to decide that. You can leave it for another day if you'd like. No, but it's just your articulation from what I'm hearing wouldn't address the situation where the tying and the tied markets are two aftermarkets, right? If you were to say dominance in the upstream market, that is premised on there being a foremarket and an aftermarket. So that statement of the rule would not address two aftermarkets that are being tied. I think that's right. I just wanted to clarify that, like, again, the rubber sort of hits the road at how the two sides in the litigation are choosing to try to define the markets and the claims and defenses in the case. Like anything can be in theory described as an aftermarket of something else, right? Or it could be attempted to be described as an aftermarket of something else. I think the question is, like, is there an argument from the defendant that this market is disciplined by some upstream market? And if you're saying that there's power in that market, that's the essence of your market power claim. You don't need the lock-in factors. They don't do any work. But as I said, I think you could leave this question to another day. This case doesn't involve that kind of an aftermarket as the tying market, and I think that makes it kind of as easy as a case could be in this posture. Did you want to reserve the balance? I did, yeah. Thank you. Okay. Good morning, Your Honors. May it please the Court. I'm Mariel Goetz for the Federal Trade Commission. We appreciate having argument time in this case in an amicus role. The FTC is here, Your Honors, because this case presents an important question of antitrust law that could extend well beyond this particular litigation. Your Honors, that's a number of good questions. I want to jump right in and try to answer some of those as well. To Judge Koh's question, I don't think the applicability of this test depends on the type of antitrust claim at issue. If there is an aftermarket being asserted that's a single brand aftermarket, you want to look at whether there's an upstream market that could possibly discipline that market. Whenever that argument's being made, that's when it's appropriate to look to competition in the for market. In this case, competition in the for market for surgical robots does not discipline the asserted market, and that's why the Kodak factors are not relevant. To step back and remember why Kodak was even making that argument, they were trying to show that the very competitive copier market would discipline any asserted abuse of market power in the aftermarkets at issue in that case. That's just simply not the case here. Your Honor, Chief Judge Magria, I think you asked, does it matter whether it's monopoly power or market power? We believe the correct rule is market power. So if the defendant has market power in the for market, proof of Kodak or Epic factors simply are not required, and that's because they don't meaningfully add to the antitrust analysis that's necessary to resolve the claim. Remember that what we're trying to get at is whether competition in some other market will restrain the defendant from harming competition in the aftermarket. You need healthy competition to perform that checking function, to perform that disciplining function. And in your view, should any rule stay silent on what the threshold is for that market power or just say, well, in this case, it's 99.5 percent, so that's sufficient? Yes, Your Honor, I don't think the court needs to get into the issue of what establishes market power. There's already a set body of law that deals with at what level do you have market power? It can vary based on the type of antitrust claim at issue. And one thing that's important to keep in mind with all of this is the Supreme Court has repeatedly emphasized that in these kinds of antitrust cases, we need to have a pragmatic, flexible approach. The threshold for what counts as market power can vary based on what Mr. Citron said earlier, the presence of barriers to entry, the ease of entry, how many potential competitors there are at the edge of the market ready to jump in if the defendant does something anti-competitive. Right. So this case doesn't present any question about where that threshold lies. And I think there's already existing case law that adequately guides the parties on that issue, Your Honor. And so in this case, does the market include general surgery and laparoscopic surgery? So as Mr. Citron explained, that's a question for the jury. That's absolutely on the table for intuitive to argue at the trial level. And market definition is often a hotly contested issue in these cases. It's simply not relevant for this court on this appeal. But I'm just curious, district judge, would the district judge have needed to wrestle with that before it went to the jury? I don't think so. I think the way it was explained earlier was correct. That juries often are given instructions where you say, if you find this, then you apply this rule. If you don't find this fact, then you apply this other rule. And I think in this case, SIS's theory of the case, as they acknowledged, they did not offer proof of the lock-in factor. So in this case, the right rule should have been, if you show market power in the market for surgical robots, then you go on and address the other elements of the claim. You don't need to decide whether Kodak factors are proven. And following up on what Judge Koh asked, is there a difference between one market and one and two aftermarkets? I don't think there is, Your Honor. I think the critical question, so in Kodak and also in Epic, you dealt with claims where the alleged tying was between two aftermarkets. But really the question is, is something in an upstream market going to prevent the abuse of market power in the downstream market? And I don't think it matters for the purposes of the rule we're asking for whether the tying claim involves tying an aftermarket to an aftermarket. I think in that situation, you would still, in order for the aftermarket to be proper, you would want to take a look at the upstream market if defendant's making a Kodak-type argument. But you have to have market power in the tied market in order to do the tying. So that's why I'm a little bit puzzled by your saying it doesn't matter. Yes, I think Your Honor's correct that as a matter of the legal elements you would need to prove, if you're asserting an aftermarket tied to an aftermarket, you would need to show market power in the first aftermarket in order to show that it's tied to the second aftermarket. But I think still what the cases sort of stand for is this idea that if you have a market where it's entirely derived from a durable piece of equipment, for example, then you want to look at the Kodak-type consideration of is the principal market, is the primary market, is there robust competition there that could possibly prevent the exercise of market power in the aftermarket? Thank you. Thank you, Your Honors. We would ask that the court correct the district court's legal error on this issue. Thank you. Thank you. Thank you, Chief Judge Murgia. Kenneth Shanmugam of Davis-Polk for Appley Intuitive Surgical. May it please the court, having failed in its efforts to sell an unauthorized modification of Intuitive's endorisk surgical instruments, SIS resorted to litigation instead. It argued that Intuitive unlawfully restricted competition in its own brand, namely an alleged single-brand aftermarket of modified endorisks. But SIS's theory is precluded by this court's decision in Epic Games, which applying the Supreme Court's decision in Kodak, established certain prerequisites for a single-brand aftermarket. There is no justification for creating an exception, and an exception is what it would be, for those prerequisites where a defendant has some degree of market power in some form market, where a contractual restriction creates the market. A plaintiff can readily allege a resulting harm to competition. Let me ask you a question. In Kodak, the Supreme Court explicitly declined to address the situation where there is, you know, not competition in the for market. And so it does seem a little bit odd to say if, you know, those Kodak factors were not even meant to address that situation, that they now should. So, Judge Koh, let me explain how I think the existing law operates here, and then I'll turn to the question of whether or not this is an exception, and if so, why the court should not create it. I think it is fair to say that what the Supreme Court was doing in Kodak was rejecting an argument by the defendant that the existence of competition in the for market precluded any sort of tying claim where the tying and tied markets were in the aftermarket. And over Justice Scalia's dissent, the court said, we're not going to create some sort of categorical exception. However, here are some factors to be taken into account in analyzing whether the claim should go forward. Turn then to this court's decision in Epic Games. In Epic Games, as in the subsequent decision in Coronavirus Reporter, the plaintiff was claiming that the defendant had market power in the for market. And yet the court articulated a rule for when single brand aftermarket claims can go forward. And parenthetically, Judge Koh, as I think your exchange with Mr. Citron illustrated, I think that this reasoning applies wherever one of the markets being defined as a single brand aftermarket, all the other claims here beyond the tying claim are essentially derivative of. But can you explain how do those lock-in factors make sense? Like, why should we look at switching costs if there's no alternative to switch to? You know, how do we, you know, those factors don't quite make sense in a situation where there's no alternatives. I would challenge the premise of that question, which I think is really the critical premise underlying plaintiffs and the FTC's position here. A customer can still switch even where the defendant has market power. Remember that under the case law, a defendant can have market power with as little as a 30 percent market share. But whether the market share is 30 or 60 or 90 or even 99 percent or even 100 percent, a customer may have alternatives beyond the defined market. And for purposes of this exchange, I'm willing to accept SIS's market definition, even though we vigorously contested it at trial and obviously vigorously disputed it. It is true that the switching costs may be higher where a defendant has market power. But the Epic Games factors themselves take that into account. And in particular, the third factor looks to whether or not significant switching costs exist. But where is the switching if you basically had no competition until, what, that Senhance robot, 2017? I guess I'm wondering, are you saying the competition is other forms of surgery? But if I wanted a missed robot surgery, what is my alternative to the Da Vinci? So it's both types of switching. It could be switching within the market or it could be switching to another market. Because going back to Learned Hand's famous statement about monopolists, even where a defendant has monopoly power and is charging monopoly prices, that defendant is charging the highest prices that the defendant can. And so while alternatives may be imperfect, they may be alternatives in another market, if the defendant seeks to raise the prices above that level, consumers will substitute away from the product. Let me ask a more specific question then. I'm sorry. This will be the last one. So if I want a missed robot surgery and there's no one else in the market that provides that robot than your client, then how do I calculate my switching costs? So it may be that the switching costs are enormous precisely because you would have to switch away to a different type of surgery, such as laparoscopic surgery or open surgery. But the reason why all of this matters, and to go to where Mr. Citron started, which is what would the conceptual justification be in this circumstance? What are the antitrust laws concerned with in this context? They are concerned with the possibility that a party will extend its super competitive power and profits into the second market, here the single brand aftermarket. That is what the Epic Games factors are designed to get at. They're designed to get at the question of whether or not what is going on is simply an ordinary contractual relationship. And this court has made clear, going back to NUCAL, which predates Epic Games, that contractually created market power is not the type of power that the antitrust laws were meant to address. And remember parenthetically, in this case, the facts are clear, that this contractual restriction has existed since day one when Intuitive introduced the da Vinci robot. So it unquestionably existed at a time when we did not have market power. The Epic Games factors are designed to get at circumstances in which a plaintiff is unknowingly locked into the aftermarket. That is a circumstance. You can see that if I don't want to switch my type of surgery, and I really, really want one of these minimal invasive tissue surgeries that's going to have to be done by a robot, I really don't have an ability to switch until there's competition for da Vinci. Well, in some sense, I think that illustrates the fundamental reason why single brand markets are disfavored, because if you define it. Is the answer to that question yes or no? Is the answer to the question of whether, you know, if you really want to have a missed robot perform the surgery, and if we had 100 percent market share, of course we have less than that, but we have significant market share, obviously, then, you know, of course, there comes a point at which the alternatives are not missed robot surgery. But I think that that point proves too much precisely because you run the risk of essentially making every manufacturer a monopolist of its own brand. If you say we're not going to look at the Epic Games factors in this circumstance, that is precisely why single brand markets are always disfavored. It seems like the Supreme Court and this court's precedent suggests that the purpose of the Kodak Epic factors is to determine whether competition in the foremarket can discipline anti-competitive conduct in the aftermarket. Am I incorrect in my reading of that? I think that's a little bit imprecise, so let me explain why. Because if that is true, I'm trying to understand why does it follow from that that there is no competition? When there is no competition in the foremarket, the Kodak factors are still relevant. I think that this specific holding of Kodak was to reject the defendant's categorical argument that the existence of competition in the foremarket precluded a tying claim. But I think that the Epic Games and factors in that scenario, you have to prove these lock in factors. Yes, I mean, I agree with you. They were rejecting Kodak's argument that, you know, categorically, if there's competition in the foremarket, you can never categorically have this claim. But they said, OK, in that situation where you have competition in the foremarket, if you can meet these factors, plaintiffs can still proceed with an antitrust claim. You agree with that, right? They did say, then you establish these lock in factors and you can still proceed with your claim despite competition in the foremarket. Well, I think what I would say is that in a circumstance in which a plaintiff can't establish those factors, that the claim may nevertheless be precluded. You know, which and I think when you look at this court's decision in Epic Games, the court, you know, stated without qualification that in order to establish a single brand aftermarket, a plaintiff has to show all of these lock in factors. And again, you know, just to be clear about why we think Epic Games and Coronavirus Reporter are controlling here, Judge Koh, it is because those were both cases in which the plaintiff was alleging that the defendant had market power in a foremarket. But you would agree in Epic Games, Apple only had 15 percent of market share in the foremarket. So there's no dispute that they didn't have dominance in the market for smartphones. I'm not sure that there was. So, I mean, I guess the question is factually, if the decisions have said in the circumstance where there's no dominance in the foremarket, then we think you've got to prove these factors. That's one thing. But if that's not our situation, why would those factors still apply? I want to address both of those things. First of all, with regard to Epic Games, you know, as we explain in our brief, I think that the relevant foremarket was the foremarket for mobile operating systems. And this court, you know, actually rejected the argument that that could not be the market because that was not the product that was being sold. And there were only two participants in that market. So I think that was the argument as to why there was market power in the foremarket. But I want to go to this conceptual justification because I think that this is critically important. I think that what the court is trying to do is to determine whether the market power, the relevant market power here arises from something other than just the voluntary contractual agreements. And what the court, what the Epic Games factors are concerned about is the circumstance in which a plaintiff can be unknowingly locked into the aftermarket. And I would dispute the premise that the Epic Games factors can't operate in a circumstance in which the defendant has market power in the foremarket. As I indicated in our earlier exchange, it may be easier for the plaintiff to satisfy the third factor in that circumstance. But the plaintiff still has to satisfy the other factors. And in particular, the first two factors are the ones that I think really drive the analysis. You know, were the relevant aftermarket restrictions not generally known? Do significant information costs prevent accurate lifecycle pricing? This is obviously not that case. SIS conceded that it could not satisfy those factors and for good reason because here you have sophisticated consumers. These are not individuals. These are hospitals and medical organizations that when acquiring the DaVinci robots are taking those costs into account. But I guess two points. First, on your first point, you would agree that the market for Apple smartphones is overlapping completely with Apple iOS, right? Because Apple does not sell its products with any other operating system other than its own proprietary. So that's like concentric circles that are overlapping. That is true. Okay. And then you would agree on the lifecycle pricing if the hospitals don't have an option other than the DaVinci. How are they doing any lifecycle pricing? Well, keep in mind that when these hospitals were entering into these agreements, you know, that was at a time, you know, in some circumstances in which the DaVinci robot was quite new. It did not have a significant share of the broader market, which we, of course, think is the correct market, which is the market for particular types of surgery. And so I don't think that SIS can argue that Intuitive had market power throughout that entire time period. And as the court will be aware, we do also make the alternative argument that Intuitive or that SIS did not make a showing on its theory that we had market power by the relevant time, which was 2019, the point at which SIS was attempting to sell modified endorisks. But to put that aside, again, I think that what the Epic Games factors are attempting to do is to establish circumstances in which you're not just dealing with ordinary voluntary contractual agreements. You're dealing with a circumstance in which the defendant is using its market power to extend its ability to charge super competitive prices into the aftermarket. And remember that if our theory is correct, a plaintiff still retains the ability to proceed on a time claim without satisfying the Epic Games factors if the plaintiff defines the aftermarket not as a single brand aftermarket. In fact, that's taking place right now in a parallel case being brought by hospitals where they have opted to define the aftermarket without reference to the da Vinci or modified endorisk specifically, but instead as an aftermarket of surgical instruments more broadly. That happened as well in the Epic Games litigation where in the Google case, Epic Games versus Google, Epic Games defined the aftermarket not as a single brand aftermarket. So our theory allows plaintiffs to choose which of those two options they want to proceed with. By contrast, the theory that's being advanced by SIS here, I would submit, is entirely amorphous, at least in two regards. The first is with regard to this question of how much market power is required. We heard my friend Ms. Goetz for the FTC say that any form of market power is sufficient. That means that a defendant with as little as 30% market share could still be subject to this claim, even though 70%… Why can't we just say 99.5 is enough? Well, you could say that, but I think our theoretical point, the point that goes back to Judge Hand, still holds, which is that regardless of whether or not a defendant has ordinary market share for market power or has a greater degree of market share for monopoly power, and of course, as Mr. Citron says, monopoly share and monopoly power are not necessarily the same thing, a consumer still retains the ability to switch away, and it may be switching away outside the defined market, precisely because the monopolist is already maximizing their profits. For the monopolist to get even greater super competitive profits, the epic games factors have to be satisfied. The plaintiff has to be unknowingly locked in to the aftermarket, and we don't have that here. Now, I know my time is short, so I do want to say a little bit about our alternative argument, because I recognize that the doctrinal question that we've been discussing over my first 17 minutes is complex, but the alternative ground for affirmance that we offer is very straightforward. As a threshold matter, SIS seemingly agrees with us on the law here. SIS seemingly agrees in its brief that if intuitive contracts permitted customers to purchase modified endorisks from approved third parties, and if that approval process was not illusory, there can be no unlawful conduct here. There's a little bit of disagreement in the briefing about the burden of proof, but I would submit that that disagreement is ultimately irrelevant, because the trial record here produced after three weeks of trial is clear. There was uncontroverted evidence in the record. First, that intuitive had a robust approval process for third-party suppliers, including suppliers of modified endorisks. Second, that dozens of products were approved for use, and, in fact, there were no circumstances in which parties sought approval and approval was denied, and there was simply no evidence that the process was illusory. What's your best case for that? Why the third-party approval process? You're asking, as an alternative theory, for us to rule as a matter of law based on the issue of whether the third-party approval process was illusory. What's your best case? So I don't think that there's any disagreement about the law on this, and we point to a host of cases. I think the photo vest case is probably the strongest case that we cite. We also cite, I think, the beta seed case and certain other cases, both cases from this circuit and other circuits. I would also point the court to the Aretha and Hovenkamp treatise, which I think sets out these principles. Chief Judge Morgia, I want to explain why this makes sense. But didn't your approvals happen after the lawsuit were filed? So I think with regard to the modified endorisks, there were two approvals for robotics and restore. It is factually accurate that those took place after both of those parties commenced litigation and that litigation was settled. It's a little bit ironic for SIS to point to that because those settlements were excluded from evidence by the district court. But we don't dispute that proposition. I would, however, point the court to the fact that the only testimony in the record on this is the testimony of Dave Rosa, who was then Intuitive's president. This is at volume four of the record excerpts at page 609. And he testified that robotics and restore, quote, submitted data for safety and effectiveness and were approved. So the fact that there were settlements. Was that for repairs or just for accessories? So this was specifically for modified endorisks, but, you know, and modified in the same way effectively as SIS was seeking to do. Now, of course, remember that SIS itself never sought approval, even in the face of the fact that we had sought data from robotics, then SIS's partner about the safety and effectiveness of their modified endorisks. But I would also point the court, Chief Judge McGee to the supplemental record excerpts, volume three at pages 548 to 556, where there is a chart of the dozens of approved devices. And these were not just. But. OK, I'm looking at your president, Mr. Rosa's testimony. He testified at trial that they hadn't approved anyone. I mean, Da Vinci's been in place since 1998. They still hadn't approved anyone as of 2019, 2020. So for 23 years, there's been not a single approval of a third party. So I don't see why if the jury has, you know, on this legal question, we have to view the evidence in light most favorable right to the non-moving party. Why that wouldn't be enough for a reasonable jury to say, yeah, they didn't approve anyone for 23 years. Judge, that's not a legitimate third party approval process. I would submit that there is no way with respect that a jury could reach that conclusion. And the sole reason that there were no approvals during that period is that no one had sought approval during that period. Parties seeking approval for modified endorisks, Judge Koh, are two for two. Two parties sought that approval and both of those parties got that approval. And the mere fact that that happened to take place after settlements in no way shows that the approval process was illusory, which is the undisputed legal standard here. And Chief Judge Murguia, to finish my answer to your earlier question about this, the reason that that standard makes sense is that where a party indicates in the contract, and this too has been in all of intuitive's contracts, that parties can use approved supplies such as these surgical instruments. The reason that that defeats a claim of a tie is simply that there is no tie in that circumstance if a party can use third party products. And the illusoriness exception just serves to ensure that there is a bona fide approval process. And again, on the approval process itself, there was extensive testimony by Dave Rosa, the individual I mentioned, about the approval process. I would point the court to the supplemental excerpts of record at 1124 to 1131 and 1170 to 1171. There was no dispute that that process was in place. There was no dispute that dozens of products beyond modified endorisks were approved, that approval requests were never rejected, and that intuitive, not surprisingly, conducted a robust analysis of safety and effectiveness because, after all, that was what was driving all of this. I think that's a really excellent argument. But in light of what Judge Koh pointed out, likely best to be made to a jury. But Chief Judge Maria Ghia, there is no contrary evidence, and I don't think that a valid inference. Well, the contrary evidence, I mean, isn't there inferences based on what Judge Koh pointed out, that there had never been any approval and that I thought there was evidence or, again, referenced to intuitive trying to shut down SIS. So is that not relevant? The relevant evidence as regards SIS is the fact that robotics, that when intuitive learned about what SIS was doing, it sought evidence about safety and effectiveness from robotics. And there is no dispute that robotics did not have FDA approval for these modified surgical instruments at the time. Now, I want to be clear. One of the oddities of what the district court did in this case was to exclude any evidence of the FDA approval process. We obviously would have wanted to point to that as the case went forward. But I think for present purposes and in response to Judge Koh's point and why I think that the jury could not draw this inference is because if you could draw an inference from the mere fact that no one had obtained approval, even though no one had sought approval, then you would always be able to get to a jury on this issue in circumstances like this. And in fact, the record indicates that when parties did seek approval subsequently, including robotics, SIS's former partner, after it got FDA approval, once intuitive was satisfied that robotics as alternative was safe and effective. In so many ways, this case is so much like IBM, right? Because IBM also made the same same types of arguments about using any of their lessees using other competitors cards. And there the court said what the chief just said. You present that to a jury. So I think IBM. It's very similar, especially if in your license you're telling the hospitals, we will not service your robot if you use a third party's, you know, equivalent of endorisks. I just anyway. So let me just I know my time is absolutely briefly. I address IBM and there's just one point I would like to make with the court's leave as I conclude. I think with regard to IBM, the reason why IBM is not controlling here is that it was a per se case that predated the Supreme Court's decision in Kodak. And because it was a per se case, there was no requirement of a showing of anti competitive effects in the downstream market. And for that reason, the court really didn't dwell on the question of how to define the downstream market, whether the downstream market was really a single brand aftermarket. And I don't think contrary to what says that what the Supreme Court said about IBM in Kodak really sheds much light on that one way or the other. But the point I want to make just very briefly in conclusion is that I do think that there is a tremendous danger that would be presented here by adopting SIS and the FTC's position. And it's not surprising that the FTC is taking this position, given that it had taken this position in the John Deere case. I think that the danger is the danger that courts have identified with regard to single brand aftermarkets more generally. I think in cases involving single brand aftermarkets, the reason that these single brand aftermarkets is disfavored is precisely the risk of making every manufacturer a monopolist of its own brand. And I think a rule that permits a plaintiff essentially to proceed with that claim by arguing that there are anti competitive effects in a market that is defined as a single brand aftermarket without requiring something more would be to stifle innovation. And in particular, as the amicus brief of the law and economics professors on our side points out, it would really stifle the ability of innovators. And there can be no dispute that Intuitive Surgical is one of this country's great innovators. It would really stifle their ability to structure their products in a way where they sell certain products separately from the primary product in the for market. That is what the Epic Games factors are designed to address. And I really think with respect, this court would be creating an exception to a rule it has already adopted. If it were to say that Epic Games and coronavirus reporter do not apply in this context. Thank you. I let Mr. Sham again go three minutes over his time. So at three minutes, hopefully you won't need the full five minutes. I hope so, too. Just a couple of things. So the rule, as the FTC puts it in his brief, I think, is the best, safest, most concise statement of the law, actually, as it already is. And the rule that would be adequate to decide this case. So on page 16 of their brief, it says, the Kodak factors are not required to establish an aftermarket as a relevant market where a defendant has market power in the for market. And that's all we're asking the court to decide. I think that suffices to reverse here. Because our theory, I mean, I appreciate the risk that we're going, you know, the alleged risk that we're going to be transforming a monopolist's control over its own brand into a source of monopoly power. But we aren't doing that here. The monopoly power comes from a regular old allegation that there is a relevant market for missed robots and that they are dominant in that market. We're not deriving the market power from some kind of contractual arrangement or anything else. This is just IBM. Again, it is for market aftermarket time where we allege a total monopoly in the for market. And the fact that there's only, that there is a aftermarket in this case with only one brand in it isn't because we're gerrymandering a relevant market. It's because they are a total monopolist in the upstream market and they require a tie between their input, the workable endorist, and the robot that only they make. It looks like a single brand aftermarket in the sense that it has only one brand in it. But what it really is is a monopoly. I would not want the court to introduce a rule that confuses the supreme evil of antitrust law with some kind of very disfavored form of market definition. One other point about innovation, the real danger from tying arrangements like this is that they allow the monopolist to take the monopoly that they have in one market. And I think that Mr. Shamingham actually conceded that they are a monopolist who is already charging a monopoly price. They take the monopoly power they have in one market and they use it to exclude competition in areas where it actually could happen. Right. It's extremely difficult to compete with intuitive in the production of a surgical robot. Their CEO testified that they have something like five billion dollars of R&D into the robot at this point. But people could innovate at the risk level. Right. They could make surgeries that are now impossible possible by innovating down at a level where less investment is required. The monopolist doesn't want that. So they make that kind of innovation impossible by imposing a tie. Right. Suboptimal things happen in the tied market as a consequence of the power in the tying market. That's what we're worried about. That's the kind of innovation that comes from competition. And that's what innovative is trying to foreclose. Can you briefly address the alternative basis for. Oh, yeah. Sure. I mean, look, look, I think this is definitely a jury question. That is the right answer. And there are, of course, free to argue that they have a approval process that represents the actual restraint. But we absolutely quarrel with the correct legal application or legal test for this. This is just an ordinary rule of reason question. They say that the actual restraint in this case is just an approval policy. It's not that they actually require you to use their risks. You can do third party risks. They just have to be approved. Right. That's the only restraint. And and they say that restraint is pro competitive because it polices for safety, protects their brand, just like an IBM. But you agree you never sought approval. We didn't seek approval because it was utterly, utterly impossible for us to get. We knew we were not going to get it. Our CEO testified that he knew he was not going to get it. And I think Mr. Sam again, again, conceded that the actual approval process that they have was antitrust litigation. Right. He's made a big deal of the fact that, you know, people who wanted to repair endow risks are two for two. But the only approval process that ever worked was four years of hard fought anti litigation and approval in 2022. After the conduct that issue in this case had already occurred. If you read Mr. DeRosa's testimony, which he pointed to, and I encourage you to do it, you will see somebody who is being very obstinate about whether or not they remember whether there was a policy before 2022 for approval. And his deposition is in the record at 3 ER 563, I think it is. And he admits there that he doesn't remember whether there was a policy before 2022. The policy for third party approval appears on their website just before the summary judgment briefing in this case. This is why we have juries to assess whether this is a bona fide thing or a pretext. Exactly as Judge Coe pointed out, as it was the case in IBM. What about the argument that you needed to establish the market power 20 years previously? So I think that first of all, we think that's forfeited. Like they didn't put it in any of the places where you need to preserve a post trial argument. Rule 50 motion, etc. But even if it weren't, there's testimony from their own expert that there were essentially no competitors between 2009 and 2018. And from one of their SVP's that they had basically no competitors. The part of the record that Judge Coe referenced about the enhanced enhanced robot. You know, they had something like a dozen robots installed to 5000 intuitive robots. I think the jury can infer that there was a lot of market power that went into creating that installed base. And as I said, you know, their own expert is testifying, but they have no that, you know, under the standard of review. That's like way more than enough for a reasonable jury to conclude that there wasn't monopoly power going back. Thank you. Mr. Citron, thank you, Miss Getz. Mr. Sham again, thank you very much for your argument presentations in this case. The case of Surgical Instruments Service Company Inc. Federal Trade Commission versus Intuitive Surgical Inc. is now submitted and we'll take a short recess at this time before hearing the next case. Thank you. All rise.
judges: MURGUIA, KOH, THOMAS